THE CITY OF MARSHALL, Plaintiff-Appellee and Cross-Appellant, *v.* CLYDE KNOWLES, Defendant-Appellant and Cross-Appellee.

Fourth District   No. 4—83—0832.

Opinion filed July 16, 1984.

Harlan Heller and Jan H. Ramsey, both of Harlan Heller, Ltd., of Mattoon, for appellant.

Richard J. Bernardoni, of Meehling, Rich & Bernardoni, of Marshall, for appellee.

JUSTICE GREEN delivered the opinion of the court:

On September 24, 1981, plaintiff, city of Marshall, filed suit in the circuit court of Clark County against defendant, Clyde Knowles (Developer). The city sought (1) a declaratory judgment concerning the validity of a document entitled "Water Line Agreement" (Agreement) purportedly entered into between the parties, and (2) specific performance by the Developer of certain terms of the Agreement. After an evidentiary hearing, the court entered an order on December 1, 1983, upholding the validity of the document and ordering Developer to make certain conveyances. The Developer appealed, and the city cross-appealed but withdrew the cross-appeal at oral argument. We affirm the decree but remand.

The Agreement was dated April 12, 1971, and was signed on behalf of the city by its mayor and by the Developer. It recited that (1) city had granted Developer permission to connect a six-inch water main from a certain city water main to his property; (2) the parties desired operation to be beneficial to those who wished to obtain city water; (3) city was willing (a) to furnish water to lines connected to Developer's waterline; (b) to "take over operation" of those service lines connected to Developer's line; (c) to assume maintenance of those lines one year after their installation; and (d) *to assume the maintenance of Developer's line "at such time as it is conveyed to the City at a date not earlier than two years nor later than ten years from the date"* of the Agreement on terms stated in the Agreement. (Emphasis added.)

By the terms of the Agreement the Developer agreed (1) to convey to city all of his rights and interest in all service lines and meters

connected thereto as soon as installed, (2) to maintain those service lines and meters for one year after their installation, and (3) to assign to city all right-of-way easements from the point of connection of the city water main to Developer's land upon the completion of Developer's waterline and the service lines. The city (1) agreed to maintain service lines after the one-year period of Developer's responsibility to do so, (2) agreed to furnish and maintain a water supply, (3) granted Developer the right to sell water taps to Developer's waterline at prices to be determined by Developer, provided that, after the Developer's waterline was conveyed to the city, the city would permit only such additional taps as would not interfere with maintaining reasonable pressure through the six-inch waterline, and (4) granted Developer the right, at any time and without charge, to connect as many taps as he wished to the portion of the main that was on his property, as long as the taps were for the purpose of serving his property.

At the time of the December 1, 1983, decree, more than 12 years had elapsed since the July 12, 1971, Agreement. The Developer had made no conveyance of the main or of any easements. The city had assumed responsibility for various service lines, but no formal conveyance of those lines had been made to the city. The decree (1) declared the Agreement to be binding and that the city was entitled to ownership of the waterlines and easements claimed, and (2) ordered the Developer to make specific performance of the Agreement by conveying to the city (a) Developer's interest in the six-inch waterline, (b) "all easements procured or owned by [Developer] on which the six-inch water main is located," (c) an easement "for the waterline on his property," and (d) all interest in the service lines to the point of meter installation.

On appeal, the parties do not dispute that the Agreement purported to require Developer to make the various conveyances within 10 years and that he has not done so. The Developer's contentions on appeal fit into two categories. First, he maintains that the Agreement was not binding as to the city because of the city's failure to follow the statutory procedures for acquiring a waterworks system. He maintains that if the Agreement were not binding on the city, the Agreement would lack mutuality and thus would not be binding on him. Second, he asserts that specific performance should not have been granted, because (1) to the extent that the rights and interests to be conveyed were realty, neither the Agreement nor the evidence produced sufficient description of the location of the interests to permit specific performance, and (2) to the extent that the interests were personalty, the interests were not shown to be sufficiently unique to

justify specific performance.

The Developer's contention that the city had no authority to enter into the Agreement is based upon section 11—127—1 of the Illinois Municipal Code, which states:

"In all municipalities where waterworks have been constructed, the corporate authorities of the municipality may purchase or lease the waterworks from the owner thereof. However, such a lease or purchase is not binding upon the municipality until the corporate authorities pass an ordinance which includes the terms of the lease or purchase therein." Ill. Rev. Stat. 1969, ch. 24, par. 11—127—1.

The Developer then calls our attention to section 11—130—2 of the Illinois Municipal Code, which defines the term " 'waterworks', as used in this Division 130" or article 11 of the Illinois Municipal Code to mean and include "a waterworks system in its entirety or any *integral part* thereof, including *mains*, hydrants, *meters*, valves, standpipes, storage tanks, pumping tanks, intakes, wells, impounding reservoirs, or purification plants." (Emphasis added.) (Ill. Rev. Stat. 1969, ch. 24, par. 11—130—2.) He contends that the Agreement involved a purchase of a main and some meters and thus was a purchase of a "waterworks" requiring the passage of an ordinance to make the agreement valid. The record here indicates that the city approved the agreement by a resolution on July 12, 1969, but no ordinance authorizing the agreement was ever passed.

Divisions 127, 128, 129, and 130, all part of the portion of article 11 devoted to water supply and sewage systems (Ill. Rev. Stat. 1969, ch. 24, pars. 11—127—1, 11—128—1, 11—129—1, 11—130—1) set forth various ways that a municipality may "purchase," "lease," construct, build, enlarge, or improve a "waterworks." All require council authorization by ordinance except Division 128, which states that the council may approve by ordinance or resolution (Ill. Rev. Stat. 1969, ch. 24, par. 11—128—1). However, Division 128 requires that the council's action be approved at referendum (Ill. Rev. Stat. 1969, ch. 24, par. 11—128—3), which was also not done here. Accordingly, if the Agreement constituted the "purchase" of a "waterworks" by the city, the required statutory procedures were not followed.

In the strict sense, the Agreement does provide for a "purchase" by the city of pipes and easements, because the city is required to give consideration. (See definition of "Purchase," Black's Law Dictionary 1110 (5th ed. 1979).) However, the whole tenor of the previously mentioned divisions of article 11 is to protect the citizens of the municipality from the incurring by the municipality of large expenditures

or substantial indebtedness in regard to the acquisition of water facilities without its governing body proceeding in a prescribed formal manner. Each division speaks of borrowing or appropriating money, levying and collecting taxes, or issuing bonds in order to finance the transaction described in the division. Here, the city was not required by the Agreement to make a substantial monetary outlay.

The principal obligations assumed by the city were to maintain service lines and one six-inch water main and to serve additional customers on the periphery of its service area. It was not a substantial obligation in comparison to the total functioning of its waterworks. The money it would collect from the sale of water would likely cover its additional expenses. An ordinance is not required to authorize the city to take on new customers for its water service. The Developer was allowed to retain a right to tap the main to obtain water for use by him on his premises, but the expenses involved in furnishing that amount of water would appear to be *de minimis* in comparison to the money the city would obtain for sale of the rest of the water that passed through the main.

■ Considering the terms of the Agreement and the circumstances of its execution, we conclude that, rather than providing for a "purchase" by the city within the meaning of the Code, the Agreement provides for a transaction which is similar to a common law dedication to the public by the Developer of the facilities described therein. Were it not for the consideration given by the city to the Developer, the transaction could be considered to be a gift. One dedicating property does receive consideration when he benefits from the property being used by the public. That consideration supports the dedication. (*Warren v. President & Trustees* (1853), 15 Ill. 236.) The reservation of certain rights by the one making the dedication does not defeat the dedication if the reservation of the rights is not contrary to public policy and does not defeat the public control and use of the property dedicated. (*Village of Lake Bluff v. Dalitsch* (1953), 415 Ill. 476, 114 N.E.2d 654.) Here, the Developer reserved the right to tap the main for his own use without charge and to sell the right to tap the six-inch main to others. The latter would then pay the city for the water they used. The reservations would not interfere with the city's control and use of the property. The reservations were not contrary to public policy.

As the transaction arising from the Agreement was not a "purchase" by the city, its action by resolution was sufficient to authorize its entry into the agreement and to bind the city. Accordingly, there was no lack of mutuality of obligation between the parties to the

Agreement. The trial court properly found it to be binding on the parties and that the city was entitled to ownership of the six-inch water main, the sewer lines and the easements described in the Agreement.

■ We now turn to the right of the city to specific performance by the Developer as ordered by the trial court. The decree directed him to convey to the city (1) his interest in the six-inch main, (2) "all easements procured or owned by [him]" on which the main is located, (3) an easement "for the waterline on his property," and (4) his interest in service lines to the point of meter installation. The developer maintains that specific performance by conveyance could not properly be ordered for any of the foregoing that constituted personalty, because none of them had the unique quality necessary to support an order of specific performance of personalty. However, the easement rights involved here are clearly real estate. (*Beloit Foundry Co. v. Ryan* (1963), 28 Ill. 2d 379, 192 N.E.2d 384.) Under the doctrine set forth in *Dunham v. Slaughter* (1915), 268 Ill. 625, 109 N.E. 673, once the court is empowered to enforce a provision in a contract for conveyance of realty, the court may also require specific performance of portions of the agreement requiring conveyance of personalty without regard to the character of the personalty.

In *Dunham*, a dispute arose between the three children of a testator. The son reached an agreement with the two daughters that he would (1) consent to the probate of a purported will, (2) convey to the daughters a quit claim deed as to all of decedent's real estate, and (3) acknowledge a receipt in full for his share in all personalty in exchange for distribution to him of three promissory notes, none of which were shown to be unique. Upon the refusal of one of the daughters to abide by the agreement, the son brought suit for specific performance. The supreme court held that such a remedy was appropriate because "an agreement to convey real estate and to transfer personal property will be specifically enforced in equity, both as to the realty and the personalty. *Leach v. Fobes*, 11 Gray, (Mass.) 506." (268 Ill. 625, 632, 109 N.E. 673, 676.) Similarly, specific performance was held to be an appropriate remedy to enforce in full a contract to sell both realty and personal property in *Kuhn v. Sohns* (1926), 324 Ill. 48, 154 N.E. 401. See also 5A Corbin, Contracts sec. 1159, at 183-84 (1964).

■ Finally, we turn to the question of whether the property rights to be conveyed can be sufficiently identified to grant specific performance. In this regard, it is important to recognize that we are not concerned with the question of whether a tract of land to be conveyed is sufficiently described. Rather, we are dealing with existing

underground conduits and the easements necessary for the conduits' existence and maintenance. Because of the particular nature of this property, the case of *Anastaplo v. Radford* (1958), 14 Ill. 2d 526, 153 N.E.2d 37, is very helpful.

In *Anastaplo*, the plaintiff's decedent (Anastaplo) had purchased two tracts of land from defendant's decedent (Radford). In connection with one purchase, the parties entered into a written agreement to permit Anastaplo to connect to and use a sewer which traversed the land of both parties. The purchase of the second tract was accompanied by an oral agreement that plaintiff's decedent could construct and use a sewer from his land through the land of defendant's decedent. The oral agreement further provided that the understanding concerning the sewer would be reduced to writing and contain a grant to Anastaplo. The sewer was installed, but Radford failed to make the conveyance and eventually dug up and blocked a portion of the sewer, rendering it useless. Plaintiff's decedent sued for equitable relief including specific performance of the oral agreement. After a hearing on the merits, the trial court denied all relief. The supreme court reversed and remanded with directions to grant the requested relief including specific performance.

As here, the defendant in *Anastaplo* contended that the agreement was vague and that the testimony did "not specify the location of the sewer, the manner in which it was to be constructed or the duration of the easement." (14 Ill. 2d 526, 537, 153 N.E.2d 37, 43.) The supreme court answered this argument by stating:

> "The short answer to this argument is that if there was anything indefinite about the agreement, the parties, by their subsequent conduct, made it definite. Anastaplo located the sewer where Radford told him to put it and built it according to instructions. Radford saw it constructed and made no objection. The matter of duration presents no problem. According to Anastaplo, Radford agreed to furnish the same type of writing as that executed with respect to the residences. That contract provided that the sewer would be a permanent drain and that neither of the parties should ever interfere with its operation. Surely this contemplated a perpetual easement." 14 Ill. 2d 526, 537, 153 N.E.2d 37, 43.

The water main here is similar to the sewer in *Anastaplo*. Here, as there, both parties knew where the underground conduits were located. Here, the parties had stipulated that the six-inch main ran from its connection with the city's main "to the land of Developer, ending in or ending on the north side of 70" running to the Devel-

oper's property. Later, the Developer demonstrated, by use of a map, the route taken by the main, but the map was not introduced into evidence. The Agreement described the point of connection as being at the end of North Seventh Street in Marshall. Instruments are now available whereby with the foregoing information the six-inch main can be easily located and followed to its terminus. The main serves somewhat as an artificial monument. We recognize the rule that a monument must be visible, but we deem the water main to be a sufficient point of reference as long as it can be located and is an aid in establishing a location. (See 12 Am. Jur. 2d *Boundaries* sec. 4, at 549 (1964).) A sufficient description has been shown for the six-inch main.

The Developer's obligation to convey to the city easements owned or procured by him can be discerned as in *Anastaplo*, by reference to existing documents. The Agreement recited that the Developer had obtained conveyance of easements from others by written document, and this was substantiated at trial. The record's lack of description (1) of the land upon which these easements are impressed, and (2) the nature of the easements, should create no problem. We interpret the decree to require the Developer to merely make conveyance to the city of whatever rights he acquired by the aforesaid documents granting easements to him. He should quit-claim to the city all interest he received by those documents. He can do no more and should be permitted to do no less. Pursuant to its inherent power to enforce its decrees, the court can, on petition, determine whether the Developer has obeyed the decree.

The Developer admitted at trial that he had made no formal conveyance of the service lines up to the point of the meter. As these lines can also be located, if necessary, by available instruments, a conveyance describing the various lots through which these lines run would be sufficiently definite.

The direction in the decree that the Developer make conveyance to the city of an easement for the "waterline on his property" creates the most difficult problem. As the course of the "waterline" can be located, determination of the center of the easement should not be a problem. However, the decree does not specify the full nature of the easement, whether it merely permits the main to lie on or under the ground, or whether the city should have the right to go upon the premises to service the main. The decree does not state whether there is a particular width to the area which may be used for any servicing of the main. This deficiency can only be corrected by remandment for the sole purpose of holding an evidentiary hearing to determine, with more particularity, the nature of the easement for the

734

"waterline on [Developer's] property." At this hearing the trial court may wish to consider the nature of the easements which the Developer has obtained from others for the portion of the six-inch main which runs through the land of others.

The decree of the circuit court of Clark County is affirmed and the case remanded to that court for further proceedings as herein directed.

Affirmed and remanded with directions.

TRAPP and MILLER, JJ., concur.